We'll move now to the last case that we'll hear today, which is Appeal 22-2916. This is Chilcutt v. Santiago. We're going to begin with some remote oral argument. Ms. Jansen, we're going to hear from you first, and you have reserved three minutes for rebuttal, correct? Correct. Very good. We'll go to you first. Good morning, Your Honors. Sarah Jansen for the appellants. May it please the Court, the first issue here is regarding this Court's jurisdiction. This is a qualified immunity case that was denied on summary judgment in the Supreme Court held in Mitchell, and this Court very recently reiterated in McGee that such denials are immediately appealable because without immediate review, the immunity from having to stand trial could be lost. There are very limited exceptions to this general rule that don't apply here because the issues here, as we discuss in our briefs and I will elaborate on today, do not just involve disputed questions of fact. The first argument is that even accepting all of the District Court's factual findings as true, plaintiff cannot show that the officers here violated any clearly established rights. Under McGee and Supreme Court precedent, the clearly established inquiry requires courts to look at the particular circumstances of each case and ask whether, under such circumstances, every reasonable officer would have understood that their conduct violated the Constitution. The Royal v. Norris Court put it this way, under the clearly established prong, qualified immunity attaches unless not even one reasonable officer placed in the defendant's shoes would have thought their conduct was lawful. Looking at the facts as adopted by the District Court here, it can't be said that every reasonable officer would have known that failing to do anything other than follow the standard suicide prevention protocols in this case was unlawful. The facts as stated by the District Court are that no one told the officers on October 21st that Mr. Chilcote was suicidal. Ms. Tuma specifically stated she did not call the police on the 21st because she believed Mr. Chilcote was suicidal. She called them because she was afraid of him and she feared for his life. Throughout all of its interactions with all of the officers on the 21st, Mr. Chilcote was calm, compliant, cooperative, and acted normally. That was during his arrest, throughout the booking process, and even after he was placed in his cell. And in the District Court's own words, with the exception of a single vague and passive statement, I guess I can go and die, in the booking room, Mr. Chilcote didn't exhibit suicidal tendencies on the 21st, and the officers didn't know whether he had any history of mental disorders or defects. What about the fact that just two weeks before, these same officers had responded to a call from his wife that he was suicidal, had gone to the house, and ended up taking him to the hospital and having him involuntarily admitted because of concerns about suicide? And that was just two weeks before? Correct. I would say, under the facts that I just stated, Your Honor, even if they were aware of Mr. Chilcote's potential suicide attempt two weeks prior, and even if the officers knew that he'd made suicidal threats in the past, it simply can't be said that every reasonable officer would have understood they had a constitutional duty to take further action to prevent Mr. Chilcote's suicide. To impose a constitutional obligation, existing precedent at the time of the offense must have made it clear that that type of conduct was unlawful. Ms. Jensen, you focus in your briefs on Mr. Chilcote's kind of demeanor on October 21. You note that he asked for cigarettes and whatnot. I looked at that video, and I also looked at the body cam videos of October 7th, when they went to answer the first call, and they visited Mr. Chilcote and escorted him to the hospital. To me, at least, it seemed that Mr. Chilcote's demeanor was pretty much the same. It didn't seem pretty remarkable one way or the other, or different one way or the other. And as Judge St. Eve noted, on October 7th, the officers thought it appropriate to take him to the hospital, but on October 21st, they did nothing. And so you're saying that there's no factual dispute at all with regard to what the officers knew at the time, given the facts in this case and the body cam footage? So on October 7th, Ms. Tumas stated to them that she was worried. That's why she called the police. She was worried that he had overdosed on his medications. She called the police. They came and responded over an abundance of caution. They took him to be involuntarily committed. And I will say, the first doctor that he encountered at the hospital actually said he didn't show any signs of depression and didn't find him to be suicidal. He went through a series of doctors. Some of them suggested he could be suicidal. But the officers didn't know that. I don't think we could consider that, because the officers didn't know that, or there's no evidence in the record that they did. Correct, Your Honor, but when I was being asked about what's the difference between them taking action on October 7th and not taking action on October 21st, my response is that they were acting out of an abundance of caution. And as far as his demeanor goes, the demeanor that he exhibited on October 7th fooled doctors. So I would say the demeanor that he exhibited was not exactly the same, but close to the same. He actually joked around a lot more on October 21st. I don't believe there was any constitutional obligation to take further action in this case. If you look at existing precedent at the time, which is what you have to do for the clearly established inquiry, there are so many more indicators in the cases like Minix and Novak and Matos that the defendant was suicidal before the courts held that there's a constitutional obligation to act. In the Minix case, one of the defendant jail officials knew that the decedent had attempted suicide on two recent occasions in the jail and had been on suicide watch for these attempts. But because she personally observed the decedent to be alert and positive, and she did not see him display any obvious signs that he was at imminent risk of suicide, the court found she was not deliberately indifferent as a matter of law in releasing the decedent from medical segregation and taking no further action to protect the decedent from suicide. The court even noted that even if that defendant had seen the decedent display strange behavior, raising a suspicion he might hurt himself, the court would still hesitate to find a triable issue of whether the official deliberately disregarded a substantial risk of suicide. I believe this case, and as I said, the Matos case and the Novak case, which were existing precedent at the time of the alleged offense, would not have put the defendants here on notice that their conduct was unconstitutional. I would also like to point out, so we believe the court can reach this conclusion without even looking at the video evidence. But once you do look at the video evidence and all the evidence that shows he's calm, cooperative, compliant, no real indicators that he is at imminent risk of suicide, that can lead the court to, or this court can find from looking at that video evidence that any reasonable officer, or not every reasonable officer in that situation would have known they had a constitutional duty to act further than what they did. I'd like to reserve the remainder of your time, Ms. Jansen. Yes. Very good. Thank you. We'll now move to oral argument for the appellee, Ms. Ravindran. Thank you, Your Honors, and may it please the court. I would like to please address some of the points that my colleague raised to this court. First of all, I'd like to discuss why the officers were on notice on October 21, 2017. There are multiple reasons the officers were on notice, not all just because of the suicidal statement that was uttered in the booking room. They also knew from that October 7th date that Mr. Chilcutt had been drinking, had taken pills, and was involuntarily committed. As Justice St. Eve rightfully pointed out, they did not have information from the discharge of that date. But even at that time, there were doctors who both saw him as suicidal and some who thought it was not a real suicide attempt. They knew about the involuntary commitment, and they disregarded that Ms. Toomis had actually told them that he had multiple suicide attempts in the past, not just the one that they picked him up for and helped with the involuntary commitment. And then on October 21st, he again had been drinking all day and night, and there had been a fight with Ms. Toomis. They still had additional knowledge of that. In addition, Officer Tabish told a trainee on October 7th that they take suicidal ideation seriously even when they're denied, which shows that he would have been on notice to hear a statement like, I guess I'll go and die, and understand that there could be a suicidal statement. And also on October 21st, they never asked Mr. Chilcutt if he was suicidal, even given the information they had that a reasonable officer would have used to assess the situation on October 21st. They also requested a regular cell instead of a holding cell, and despite taking the drawstring from Mr. Chilcutt's shorts and the shoelaces from his shoes, they gave him a blanket. So there are many, many points that would have given them notice on that date. I'd also like to – one other point I'd like to make is that Judge Shaw also found that Mr. Chilcutt in the booking room video was muted, so although the attorneys have indicated that he was calm and had a calm demeanor on the date of October 21st, that's also a question of fact for the jury who's going to see the booking room video, and they'll be able to assess for themselves what Mr. Chilcutt's status was at that time, what his demeanor was. In addition, we've heard the statement referred to as a vague and passive statement. I would just like to address that briefly in that the statement used the words go and die, which as we all know, suicide has to do with death. I don't believe that would be vague and passive, as heard from an officer who knew that the individual had multiple suicide attempts in their past just from two weeks prior. And there is no question regarding whether or not Officers Tabish and Santiago recalled the prior date, as they referenced it multiple times on body-worn camera on October 21st, and so I'd just like to make that point as well. Finally, I'd like to move on to – oh, I still have seven minutes, so not finally, but I would like to move on to discuss some of the cases that my colleague raised that would have indicated that this right was not clearly established. First, turn to the Minnix case, which is easily distinguished because in that case, the decedent was asked about his suicidal tendencies and denied it. There were no additional signals, and even though he had been housed in medical segregation, one other very big distinction in that case is that the decedent was seen by a nurse and assessed by a medical professional. He was held in medical segregation for two days, but after his denial of suicidal tendencies, he was taken off medical segregation by a professional who could assess mental health. Here we have none of those facts. The Minnix is not a case that would have told our defendants here that they would not have been on notice. They also referenced the Novak case. The Novak case specifically was only deciding whether or not the municipality was deliberately indifferent as the court assessed the potential of a Monell claim in that matter, and I believe another case that was cited was the Matos case, which is in, I believe, all of the briefs, and Matos is easily distinguished as well. In that case, there was a note of a prior suicidal ideation that was not read, and the individual denied suicide in multiple evals and also indicated that he was depressed in general about death and did not indicate that he had a clear suicidal ideation of his own. In contrast to those cases, the plaintiffs cite to Hall v. Ryan, Cavalieri, and the estate of Clark v. Walker, which all would have put defendant's officers on notice that if they had information, they should turn it over or could be considered deliberately indifferent. They were on notice from the Hall v. Ryan case that regardless of whether... My apologies, Your Honor. In the Hall v. Ryan case, it would have been put on notice that without consulting the file, the relatives, a chief, or the newspaper, unlike what had to be consulted in Hall v. Ryan, the officers had firsthand knowledge of Chilcott's mental health hospitalization and potential suicide attempt, so they actually had more information than the Hall v. Ryan case, which would have put them on notice that their conduct or lack thereof would be unconstitutional. Turning to the Cavalieri case, Cavalieri would have placed Santiago and Tabish on notice that their conduct of failing to pass on information regarding Chilcott's suicide risk because they believed him to be calm would have violated his constitutional rights. The Cavalieri case would have also put the officers on notice that even if in their discretion they believed Mr. Chilcott to not be a suicide risk at the time, they could still violate his rights by not passing on pertinent information to individuals who he remained in their custody. Cavalieri had a detective defendant who investigated a potential suicide threat by an individual who had also kidnapped his girlfriend, and after speaking to family members, he then contacted the decedent in jail and asked how he was doing. The decedent said he was doing fine, and because of that reason, the detective defendant did not relay information of the prior suicidal ideations, the attempt, or that the family members had indicated his suicidality to the jailers who Mr. Cavalieri remained in custody of. So that would also have put these officers on notice. I would also point to the Sandville case, which is one of the only cases with a clear suicidal statement that's being given, and the officers in that case in Sandville were on notice that ignoring a suicidal statement that was provided to officers could also be deliberately indifferent of a known suicide risk that would violate constitutional rights. So there's an abundance of notice that would have been provided to these officers. We can also turn to the estate of Clark, where the intake officer ignored the Spillman report that came from the computer system, which you input information to understand if there is a suicide risk. The individual in that case was given the highest rating of suicide risk, maximum suicide risk, and that jailer did not put that decedent into suicide watch despite that information and did not relay that further. So I believe they would be squarely on notice that in all of these cases, having the information that our defendant officers did would be a violation of someone's constitutional rights if they did not take further action. And further, showing a deliberately indifferent point, what we can see from these officers is even with the information, they are not asking the questions, they're not relaying information, but what's more, they're making determinations to put Mr. Chilcutt into a regular cell outside of the view of the camera instead of a holding cell and also, again, giving him the blanket. Your Honors, I would like to turn to an additional point with my remaining time. With regard to what inquiries this court is left with to determine, it's a rather simple question because in both cases, when you look at the two elements of qualified immunity, we are asking did these officers act reasonably in a way? When we look at whether the law is clearly established, we are asking would a reasonable officer with the same knowledge, training, and encountering the same situation be on notice that their actions or inactions violated Chilcutt's clearly established rights? We're looking at that reasonableness of what a reasonable officer would understand they are on notice of. What would they have a fair warning of? And the case law established as far back as Hall in 1992 says that these officers here would be on notice. The second inquiry determining if a violation occurred would ask the question would a reasonable officer with the same knowledge, training, and encountering the same situation that Santiago and Tabish created have acted differently? Here, I believe the answer is yes, and I think the record is full of information that supports that conclusion. Would a reasonable officer fail to inform Gordon of knowledge from the prior arrest, Officer Gordon, who completed the booking? Would a reasonable officer fail to further evaluate Chilcutt or place him in a holding cell? And would a reasonable officer with the exact information here hand Chilcutt a blanket? The answer here is clearly no. I thank you for your time, and if there are no questions, I have nothing further. Thank you, Ms. Ravendran. We'll now move back, Ms. Jansen, to you for rebuttal argument. Thank you, Judge. I would like to address a couple things. First, the standard for the clearly established prong is would every reasonable officer have known in the particular circumstances that their conduct violated the Constitution? Every reasonable officer, even if one officer thought that their conduct was lawful, that's enough for the clearly established prong of the qualified immunity. Another thing I'd like to address is there's no constitutional requirement to ask if Mr. Chilcutt was suicidal. None of the case law says that. The district court mentioned that they didn't ask. Plaintiff's counsel mentioned that they didn't ask, but there was no constitutional requirement at the time, nor is there one now. Another point I'd like to make is the vague and passive language that I referred to came straight from the district court. He said the statement, I guess I can go and die, is a vague and passive statement, and that's on page 22 of his opinion. So all we have in the booking room at the time to show that the officers knew he was an imminent risk of suicide was that he made a vague and passive statement that could have been interpreted as a suicidal statement. And in regards to that statement, we believe it was wrong for the district court to actually raise an inference from plaintiff's attorney's speculation that that's exactly what Mr. Chilcutt said. The plaintiff never said that's what Chilcutt said. None of their witnesses ever said that's what Chilcutt said. It's plaintiff's attorney's speculation that Mr. Chilcutt said, I guess I can go and die in the booking room. It's not a clear statement at all, and when we're talking about qualified immunity, officers are entitled to make a reasonable mistake in judgment. If you can interpret the statement in question, if there's reasonable varying interpretations, then they would be entitled to qualified immunity. I see my time has expired. In conclusion, I would just ask that you reverse the district court and grant qualified immunity to the officers. Thank you. Thank you, Ms. Jansen. Thank you, Ms. Ravidran, as well as your colleagues. The case will be taken to revisement, and that will complete our hearings for the day.